

# NUMBER 13-22-00480-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF J.P.S., A CHILD

On appeal from County Court at Law No. 5
of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Justices Benavides, Tijerina, and Peña**
**Memorandum Opinion by Justice Benavides**

Mother appeals from a judgment terminating her parental rights to J.P.S. By a single issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the child's best interest. We affirm.

### I.    BACKGROUND

This case was tried to the bench over the course of three days on March 14, July

29, and August 16, 2022.[1]

## A.    Circumstances of Removal

J.P.S. was born in August 2017. In August 2020, J.P.S., Mother, and Mother's paramour, Nicole Ybarguen, were living with Father at his residence in Corpus Christi. J.P.S.'s Maternal Grandmother also resided on the property in a separate dwelling. Father, who was blind and suffered from other debilitating medical conditions, required a provider seven days a week.

That same month, the Texas Department of Family and Protective Services (Department) received a report that Mother physically assaulted Father by kicking and slapping him "to the point he had to push his life alert button." At the time, Mother was on probation for felony assault involving a child, elderly person, or disabled person.[2] The altercation reportedly started when Mother was asked to move out of the residence due to concerns that she was "doing drugs." Maternal Grandmother reportedly told the Department's investigator that Mother would leave J.P.S. in Father's care while she did heroin. After the altercation, Mother and Ybarguen absconded with J.P.S., and Father and Maternal Grandmother expressed concern for J.P.S.'s wellbeing due to Mother's drug use and instability.

The Department eventually located Mother, Ybarguen, and J.P.S. living at the home of Ybarguen's mother in Waller, Texas. A Department investigator visited the residence to do a welfare check on J.P.S. and spoke with Mother and Ybarguen. Mother

---

[1] A review hearing was conducted on May 18 and June 27, 2022, but we have not been provided transcripts of those proceedings.

[2] The record is silent on the circumstances of this prior assault.

acknowledged that she was asked to leave Father's residence but denied that she assaulted Father or uses drugs. Ybarguen, on the other hand, acknowledged that she has a history of drug use and had recently completed treatment for opiates. Ybarguen's mother acknowledged her own previous conviction for possession of methamphetamine but said she had been clean for years.

The Department requested that Mother and Ybarguen submit to drug tests. After the couple missed their first two appointments, the Department sent an employee to the residence to transport them to the testing facility. When the transporter arrived, an unknown woman approached the transporter and informed her that Mother intended to use another person's urine to pass the test. The unknown person also accused Mother of using drugs and causing problems at the residence. The transporter then witnessed Mother, Ybarguen, and Ybarguen's mother "engage in a physical altercation with the unknown woman," who "screamed for help and assistance." This altercation occurred in front of J.P.S.

The police responded to the scene and arrested Mother and Ybarguen. Attempts to contact Father were unsuccessful, leaving then three-year-old J.P.S. without a legal guardian to care for him. The Department took emergency possession of J.P.S. and subsequently filed its Original Petition for Protection of a Child, for Conservator, and for Termination in Suit Affecting the Parent-Child Relationship.[3]

**B.     The Child's Placements**

In December 2020, the trial court approved a kinship placement with Maternal

---

[3] The suit was originally filed in Grimes County, Texas, where the emergency removal occurred, but was later transferred to Nueces County upon the parties' request.

Grandmother after she addressed the Department's concerns about hazards on the property. However, in February 2021, Father died of a suspected drug overdose from heroin and barbiturates. Because this incident occurred on the same property where J.P.S. was residing, the Department requested that Maternal Grandmother submit urine and hair samples for drug testing. According to the Department, Maternal Grandmother passed the urinalysis but initially refused the hair follicle test. After several delays, Maternal Grandmother took a hair follicle test and tested positive for marijuana and methamphetamine. Those test results were filed with the trial court and included in the appellate record.

As a result of the failed test, the trial court ordered that J.P.S. be removed from Maternal Grandmother's care. In May 2021, J.P.S. was placed with foster parents Priscilla Lerma and her husband, where he remained through trial.

## C. Mother's Family Service Plan

The trial court ordered Mother to complete a family plan of service designed to address concerns about Mother's drug use, mental health, parenting skills, and overall stability. Due to delays from the ongoing COVID-19 pandemic, this case was pending in the trial court for nearly two years. It is undisputed that for most of that time, Mother made no progress on her services, including repeated failures to submit to drug testing, which was a prerequisite for Mother to have visitation with J.P.S.

However, in the fall of 2021, Mother was ordered to an Intermediate Sanction Facility (ISF) for violating the terms of her probation, and Department caseworker Joe Avila testified that after Mother's release on March 31, 2022, "she really hit the road

4

running" in terms of completing her services. As of the July 29, 2022 trial setting, Mother had completed her parenting classes, her mental health and substance abuse assessments, all but two of her mental health counseling sessions, and eight out of thirty-six hours of group sessions and eleven out of sixteen classes of individual counseling for substance abuse.

Mother testified that she had turned her life around since being released from ISF, where she underwent five months of in-custody substance abuse treatment. Mother acknowledged that she is bipolar, schizophrenic type, and has "PMDD, with high anxiety and depression," but said that, unlike before, she was now taking her prescribed medications and regularly visiting several different mental health professionals, including a psychiatrist. Mother explained that these efforts had provided her with "mental stability." Mother also insisted that she had remained drug free since her release from ISF.

The Department expressed serious doubts about Mother's claimed sobriety. According to Avila, Mother submitted urine and hair follicle samples shortly after her release from ISF, both of which came back negative. Afterwards, though, Mother "had 13 no shows at the drug testing facility." Avila testified that on more than one occasion, Mother lied to him about submitting herself for drug testing: she would tell Avila that she had gone to the drug testing facility, but the facility had no record of her visit. When she did appear at the testing facility on May 17 and July 28, 2022, Mother agreed to submit urine samples, which came back negative,[4] but refused to provide hair follicle samples.

Availa testified that the Department requested the May 17 testing after Avila made

---

[4] The urinalysis from July 28 came back "NEGATIVE-DILUTE."

an unannounced visit to Mother's home on May 16 and observed Mother displaying "concerning" behavior. When Avila initially arrived at the home between 10:00 and 11:00 a.m., Mother was sleeping on a mattress on the floor. According to Avila, Mother "appeared disheveled," "was swaying back and forth," and "couldn't sit still." Additionally, Mother "wasn't able to focus on the question [Avila] was asking" and got confused about what year it was. Avila asked Mother to take an oral swab drug test on the spot, but she declined, saying she did not trust the accuracy of those tests. Instead, Mother went to the drug testing facility the next day and provided a urine sample but not a hair follicle sample, as required by the trial court for visitations to occur.

Avila further testified that between the July 29 and August 16 trial settings, he requested Mother to submit for drug testing on August 4, but she again failed to appear. Avila said he communicated this request to Mother by text message using a phone number recently provided by Mother's attorney and that he previously used this number to communicate with Mother.

Mother acknowledged that she had not complied with all the Department's requests for drug testing since her release from ISF but said it only occurred twice, once because she did not have transportation to the facility and the other time because of a family emergency. According to Mother, she did not provide a hair follicle sample during the July 28 visit because the testing facility did not request one. Mother said she appreciated the importance of proving her sobriety after the trial was recessed on July 29 but claimed that she did not receive Avila's text message requesting her to test on August 4. In any event, Mother testified that the Department's concerns were misplaced because

6

she was required to drug test twice a month as a condition of her probation. According to Mother, the State had not moved to revoke her probation since her release from ISF, which necessarily proved that she had passed those drug tests.

On cross-examination, Mother acknowledged that she "was unable to find [paperwork]" to substantiate her claim that she only missed two drug tests after her release from ISF. She also acknowledged that although the results of her probation drug tests were at one time shared with her caseworker, they were not currently being shared with the Department. Mother also said that, although she receives a "slip of paper for the sample" each time she tests for probation, she did not keep any of these receipts. Finally, Mother acknowledged that although she was not provided advanced notice of her drug tests for probation, the probation department's practice was to test her each time she reported, and those appointments were scheduled approximately two weeks in advance. It was not clear from Mother's testimony whether probation required her to submit a urine sample, a hair follicle sample, or both.

## D.     The Department's Plans for the Child

At the conclusion of the trial, J.P.S. had been in his foster placement with the Lermas for sixteen months. During that time, Mother had no visitation with J.P.S. because she was either incarcerated or noncompliant with her drug testing requirements. According to Avila, the child was "doing great" with the Lermas. They were providing "really good structure" for J.P.S., including recreational activities like swimming and going to the movies. They took him to all his doctor appointments and ensured that he was receiving "all that he needs." The Lermas had already adopted two other boys, ages nine

7

and eleven, and Avila stated that J.P.S. was bonded with both. Avila also observed a bond between the parents and J.P.S. and agreed that J.P.S. has "a strong and loving relationship with everyone in his current home." Avila believed that it would be in J.P.S.'s best interest to remain with the Lermas and be adopted by them.

Priscilla testified that over the sixteen months J.P.S. had been in their care, he had bonded with her younger son, saying "they play [and] do everything together." Priscilla also said that she and her husband "definitely" want to adopt J.P.S. According to her, J.P.S. never asked about Mother or expressed a preference to live with Mother. Priscilla believed that her family had met J.P.S.'s emotional, educational, and health needs and would continue to do so in the future.

## E.    Mother's Plans for the Child

Upon Mother's release from ISF, she moved in with Maternal Grandmother and continued to reside there through trial. Although Mother was on several waiting lists for government assisted housing, she acknowledged that she was "at the bottom" of these lists, and there was no indication that she would soon secure a place of her own. Mother further testified that despite her best efforts, it had been difficult to obtain steady employment due to her criminal history. She said she had been able to perform odd jobs for money, including mowing lawns and cleaning houses with her sister, but was considering filing for Social Security Disability Insurance (SSDI), believing that it "would be the only way to have a stable income for [her] children." Therefore, returning the child to Mother would mean that J.P.S. would also be living with Maternal Grandmother—and possibly Ybarguen—for the foreseeable future. The Department did not believe this

8

arrangement would provide a safe environment for J.P.S. for several reasons.

First, although Maternal Grandmother's home was previously approved by the Department, Avila testified that the condition of the home had since deteriorated. During his unannounced visit to the home in May 2022, Avila observed that the home was in "disarray," there was "trash cluttered throughout the inside of the home," and the home "was not clean or sanitary." Moreover, Avila testified that he was bitten by fleas while visiting the home. Avila visited the home again in late July but could not gain entry to the home because of an aggressive dog. He observed a cluttered front yard with "objects that could be [a] danger to a child." Avila also visited the home in August, but Mother was not home, and Mother's sister would not grant him access to the home. Avila said the dangerous objects in the yard had not been removed.

Maternal Grandmother acknowledged that her place was in "disarray" when Avila visited in May but attributed it to the fact that Mother "and them move[d] in here and they had all their stuff." She pointed out that she was able to clean up the home to the Department's satisfaction once before and believed she could do so again. She also acknowledged the flea problem, which she attributed to her pets, but said the issue was now resolved. On cross-examination, Avila acknowledged Maternal Grandmother's efforts to address the Department's previous concerns about the condition of the home and agreed that it was possible that she could do so again. He also admitted that he could not say whether the flea problem had been abated since his visit in May but pointed out that he had not been able to gain entry to the house in July or August to test her claims.

Beyond the condition of the home, the Department was also concerned about

Maternal Grandmother's drug use. As previously mentioned, after Father's suspected overdose, Maternal Grandmother tested positive for marijuana and methamphetamine, prompting J.P.S.'s removal from her care. According to Avila, Maternal Grandmother had refused the Department's repeated requests that she submit to further drug testing. Despite these concerns, the Department allowed Maternal Grandmother supervised visits with J.P.S. twice a month after he was removed, and by all accounts, these visits went well.

During trial, Maternal Grandmother flatly denied that she ever failed a drug test or used methamphetamine. According to her, any positive test was simply incorrect. She also denied that she had refused any subsequent requests by the Department to take a drug test. Avila often sent these requests by text message, and Maternal Grandmother hypothesized that she may have missed his texts because she loaned her cell phone to several people, including Mother. When her attention was drawn to a specific text message exchange where she acknowledged that she was the person responding, she again denied that she had seen a prior text message requesting that she take a drug test.

Finally, the Department expressed concern about Mother's ongoing relationship with Ybarguen. When Mother was released from ISF in March, she told Avila that she was no longer in a relationship with Ybarguen because they "were better off separate[d]." However, when Avila made an unannounced visit to the home in May, Ybarguen was present at the home, even though Mother was asleep. Mother later confirmed that the two were in a dating relationship again. Avila explained that Mother's involvement with Ybarguen was concerning for the Department because Ybarguen has an admitted history

10

of drug abuse and failed to submit to the Department's requests for drug testing throughout the pendency of the case.

Mother acknowledged that she is still in a relationship with Ybarguen but said they are taking things slower and no longer living together. She explained that they had previously "rushed into that before and it—it had bad consequences." Maternal Grandmother also acknowledged the ongoing relationship but said Ybarguen does not live with them and only visits on occasion.

In terms of Mother's development since being released from ISF, Maternal Grandmother said she noticed an "immediate change" and that "[Mother's] progressively getting better and better." The biggest change she observed was Mother's concern for J.P.S. and her willingness to take the necessary steps to be reunited with him. She described how Mother, out of necessity, would take the bus to make her various counseling appointments, adding hours to each trip. Maternal Grandmother further testified that Mother has been regularly taking her prescribed medications and meeting with a mental health professional. According to Maternal Grandmother, during her visits with J.P.S., he asked how Mother was doing and expressed concern for her. Ultimately, Maternal Grandmother believed it was in J.P.S.'s best interest to maintain a relationship with Mother. In her opinion, "[s]he was an excellent mother[,] she just had a few mental things she had to get taken care of[,] and now she's headed right back to where she was."

Mother acknowledged that the Lermas "are wonderful people"; however, she also believed that, if given the chance, J.P.S. could have a good life with her "because [she] can be a great mother." But Mother also agreed that it is not in J.P.S.'s best interest to be

11

around drugs or drug users, and consequently, she understood that the central issue in this case was whether she could demonstrate that she was no longer using drugs or surrounding herself with others who use drugs.

## F. The Trial Court's Ruling

The Department asked the trial court to appoint the Department as the child's permanent managing conservator, to continue the child's placement with the Lermas, and to terminate Mother's parental rights. Mother asked that her rights not be terminated and requested possessory conservatorship. The trial court found by clear and convincing evidence that Mother had engaged in conduct, or knowingly placed the child with persons who engaged in conduct, which endangered the physical or emotional well-being of the child; had constructively abandoned the child; had failed to comply with the provisions of a court order that specifically established the actions necessary for the return of the child; and had used a controlled substance in a manner that endangered the health or safety of the child and either failed to complete a court-ordered substance abuse treatment program or, having completed such a program, continued to use controlled substances afterwards. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (N), (O), (P). The trial court also found by clear and convincing evidence that terminating Mother's parental rights would be in the child's best interest. *See id.* § 161.001(b)(2). This appeal ensued.

## II. STANDARD OF REVIEW & APPLICABLE LAW

A parent has a constitutional right to the care, custody, and control of her child. *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022); *In re C.J.C.*, 603 S.W.3d 804, 811 (Tex. 2020). Accordingly, in proceedings to terminate the parent-child relationship, the petitioner is

required to prove by clear and convincing evidence one of the statutory termination grounds and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1), (2). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

In parental termination cases, our legal and factual sufficiency standards honor this elevated burden of proof while respecting the role of the factfinder. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* In a legal sufficiency review, we "cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id.* at 630–31 (citing *In re J.F.C.*, 96 S.W.3d 25, 266 (Tex. 2002)). Thus, "[e]vidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Factual sufficiency, on the other hand, requires us to weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* We "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)). Therefore, "[e]vidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so

13

significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266).

In reviewing for factual sufficiency, however, we must be careful not to usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Deciding whether to credit evidence and how to weigh its probative value is the factfinder's role, not ours. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). The factfinder is the sole arbiter of witness credibility and demeanor. *Id.* In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts, and evaluates witnesses' demeanor and credibility. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

The best-interest component of the termination analysis "is child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d at 746 (quoting *In re A.C.*, 560 S.W.3d at 631). Although there is a "strong presumption" that keeping a child with their natural parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE. ANN. § 153.131(b)), it is also presumed that "the prompt and permanent placement of the child in a safe environment" is in the child's best interest. TEX. FAM. CODE. ANN. § 263.307(a).

Courts consider a nonexclusive list of factors to guide their best-interest analysis: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best interest; (6) the plans for the child by those

14

individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re J.W.*, 645 S.W.3d at 746 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). Each case is fact specific, and the petitioner is not required to prove that each *Holley* factor favors termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

The Legislature has also provided guidance on factors for courts to consider. *See* TEX. FAM. CODE. ANN. § 263.307. Finally, the same evidence that supports a termination ground may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28 (citing *Holley*, 544 S.W.2d at 370); *see, e.g.*, *In re J.W.*, 645 S.W.3d 726, 747–48 (Tex. 2022) ("[T]he same evidence that supports termination of Father's rights under Subsection (O) also supports the best-interest finding." (citing *In re J.F.C.*, 96 S.W.3d at 275)).

### III.    ANALYSIS

Mother does not contest the sufficiency of the evidence supporting the four separate termination grounds. *See* TEX. FAM. CODE ANN. § 161.001(b)(1) (E), (N), (O), (P). Instead, she contends that the record is legally and factually insufficient to support the trial court's finding that termination was in the child's best interest. *See id.* § 161.001(b)(2). Specifically, Mother asserts that "the totality of the evidence" does not support the trial court's finding; however, Mother narrowly focusses on evidence contrary to the finding without addressing the substantial amount of supporting evidence. Viewing the record under the appropriate standards of review, we conclude that the factfinder

15

could reasonably form a firm conviction or belief that termination was in the child's best interest.

Considering the evidence in the light most favorable to the trial court's ruling, the record establishes that Mother has a long history of violent behavior and substance abuse that endangered J.P.S. Mother was placed on probation for felony assault in 2016. In 2017, she physically assaulted Father after he asked her to leave his residence because of her "drug use." *See id.* § 263.307(b)(7) (listing "whether there is a history of abusive or assaultive conduct by the child's family" as a best-interest factor); *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (holding that evidence of domestic violence supported a best-interest finding even though the child was not a victim of the violence); *see also In re A.H.*, No. 04-15-00416-CV, 2015 WL 7565569, at *7 (Tex. App.—San Antonio Nov. 25, 2015, no pet.) (mem. op.) ("Evidence of the parents' history of domestic violence supports the trial court's best interests finding."). Maternal Grandmother complained that leading up to the altercation, Mother would leave three-year-old J.P.S. in Father's care while she got high on heroin, even though Father was blind and required care from a provider seven days a week. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(C) (listing the ability to demonstrate adequate parenting skills, including "supervision consistent with the child's safety," as a best-interest factor). Shortly after the physical altercation that initiated this case, Mother assaulted a woman in front of J.P.S., leaving the child without a legal guardian to care for him. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and

16

emotional well-being of a child."). Moreover, Mother was later sanctioned to ISF for violating the terms of her probation. *See In re G.N.*, 510 S.W.3d 134, 139 (Tex. App.—El Paso 2016, no pet.) (holding that a best-interest finding was supported by evidence that the parent continued to engage in criminal activity during the pendency of the case); *see also In re A.L.K.*, No. 11-08-00226-CV, 2009 WL 1709249, at *7 (Tex. App.—Eastland June 18, 2019, no pet.) (mem. op.) (same); *In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *21 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.) (same).

Mother argues that her circumstances substantially improved after she underwent five months of in-custody substance abuse treatment. At trial, it was undisputed that in the final five months of the case, Mother showed a commitment to treating her mental illnesses and completing some of her services, facts that were contrary to the court's best-interest finding. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11). As a general matter, though, the trial court was free to weigh Mother's recent improvements against her much longer history of endangering conduct when assessing whether termination was in J.P.S.'s best interest. *See In re J.O.A.,* 283 S.W.3d at 346 ("While the recent improvements made by [appellant] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."); *Jordan v. Dossey*, 325 S.W.3d 700, 732 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Although evidence shows [appellant] has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices."); *see also* TEX. FAM. CODE ANN.

§ 263.307(b)(11) (listing "the willingness and ability of the child's family to effect positive environmental and personal changes *within a reasonable amount of time*" as a best-interest factor (emphasis added)).

Irrespective, the Department disputed Mother's contention that she was fully rehabilitated; namely, that she had maintained her sobriety after being released from ISF. "[A] fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs." *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.)); *see also In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (mem. op.) ("Father's failure to submit to drug testing, through which the trial court could infer Father's continued prescription drug abuse, is relevant to multiple *Holley* factors, including [the child's] emotional and physical needs now and in the future, the emotional and physical danger to [the child] now and in the future, Father's parental abilities, the stability of Father's home, and the acts or omissions which may indicate an improper parent-child relationship."). Missing drug tests is also evidence that a parent failed to take advantage of available support systems. *C.C. v. Tex. Dep't of Fam. & Protective Servs.*, 653 S.W.3d 204, 219 (Tex. App.—Austin 2022, no pet.).

Here, Avila testified that Mother "had 13 no shows at the drug testing facility" after her release from ISF, and the trial court was free to credit his testimony over Mother's contrary testimony that she only missed two tests due to reasons beyond her control. *See In re J.O.A.*, 283 S.W.3d at 346. The record establishes that Mother only submitted one

hair follicle sample after her release from ISF. As the Department pointed out during trial, this sample, which was taken approximately two weeks after Mother's release, only proved that Mother had not consumed illicit drugs while she was incarcerated or during the short period since her release. Afterwards, Mother passed a urinalysis on May 17 and July 28 but refused to provide a hair sample on those dates. She also refused numerous other requests for urine and hair follicle testing after her release. This evidence allowed the trial court to reasonably infer that Mother was avoiding drug testing because she was using drugs again. *See In re E.R.W.*, 528 S.W.3d at 265.

Nevertheless, Mother testified that she had remained clean since her release from ISF. As proof, she testified that she was regularly tested as a condition of her probation and insinuated that she must have passed these tests because the State had not sought to revoke her probation again. The Department pushed back on the probative force of this testimony, pointing out that the results of these tests were not being shared with the Department. Additionally, Mother acknowledged that, based on the probation department's practices, she had advance warning of when she would be tested.

Importantly, after the trial recessed on July 29, Mother had nearly three weeks to gather evidence to substantiate her claim that she had remained drug free in the months following her last hair follicle test. Yet, when the trial resumed on August 16, Avila testified that Mother had once again refused to submit to the Department's request for drug testing on August 4. Mother disputed that she received this request, but the trial court was free to resolve this disputed evidence in the Department's favor. *See In re S.R.*, 452 S.W.3d 351, 358 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (explaining that when

19

reviewing the factual sufficiency of the evidence, "[w]e are not to 'second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible.'" (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003)).

Regardless, Mother failed to offer any further evidence to corroborate her claims, and the trial court was left to weigh the credibility of the witnesses and draw inferences from their testimony.[5] *See In re J.O.A.*, 283 S.W.3d at 346. In the face of the Department's testimony about Mother's numerous missed tests, we conclude that Mother's contrary testimony that she remained drug free was not "so significant that the factfinder could not have formed a firm belief or conviction" that Mother's drug use remained an ongoing problem. *See In re A.C.*, 560 S.W.3d at 631. This was a substantial finding that supported the trial court's best-interest finding, especially where it impacted Mother's ability to exercise visitation with J.P.S. *See In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston 2016, pet. denied) ("A parent's drug use supports a finding that termination is in the best interest of the child."); *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) (explaining that a factfinder can give "great weight" to the "significant factor" of a parent's drug-related conduct).

Beyond Mother's ongoing drug use, the record also establishes that Mother continued to surround herself with others who use drugs. *See* TEX. FAM. CODE ANN.

---

[5] For example, even if Mother did not receive the Department's August 4 request, it would have been prudent under the circumstances for Mother to contact the Department and arrange a hair follicle test before trial resumed. She also could have provided copies of the results from her probation tests or subpoenaed her probation officer to testify that she was compliant with the terms of her probation. Instead, Mother elected to stand on her testimony alone.

§ 263.307(b)(8) (listing "a history of substance abuse by the child's family or others who have access to the child's home" as a best-interest factor). At the time of trial, Mother was living with Maternal Grandmother and indicated that she would continue living with her for the foreseeable future. Mother had also resumed her dating relationship with Ybarguen, who was present at Mother's home during Avila's unannounced visit in May 2022. Maternal Grandmother and Ybarguen both had a recent history of drug use, and each refused to submit to the Department's repeated requests that they submit to drug testing. Like Mother, their refusal to drug test allowed the trial court to infer that both continued to use drugs. *See In re E.R.W.*, 528 S.W.3d at 265. This potentially endangering conduct supported the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 263.307(b)(8).

In contrast, it was uncontested that J.P.S. was well cared for in his foster placement with the Lermas. *See In re L.G.R.*, 498 S.W.3d at 205 ("The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest."). And due to her incarceration and failure to adhere to testing requirements, Mother had not seen J.P.S. in sixteen months. *See In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child . . . has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires."). It was also uncontested that J.P.S. had bonded with the Lermas, who were looking forward to adopting him. *See id.* ("When a child is too young to express h[is] desires, the factfinder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent."); *In re C.H.*, 89 S.W.3d at 28 ("Evidence about

21

placement plans and adoption are, of course, relevant to best interest."). When comparing the contrasting plans for the child by Mother and the Department and considering the need for permanence, this factor weighs heavily in favor of the trial court's best-interest finding. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (explaining "that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs").

Having considered the entire record under the appropriate standards of review, we conclude that the trial court could have formed a firm belief or conviction that terminating Mother's parental rights was in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Consequently, the evidence was legally and factually sufficient to support the trial court's best-interest finding, and Mother's sole issue is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
2nd day of March, 2023.

22